UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>   vs.<br><br>ALEXANDROS THYMARAS,<br><br>          Defendant. | 5:14-CR-50063-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress Evidence (Doc. 51). An evidentiary hearing was held on April 23, 2015, through April 24, 2015. Defendant was personally present and represented by his attorneys of record, Brian L. Gardner, Michael S. Weinstein, and Jeffrey Connolly. The Government was represented by Sarah Collins and Benjamin Patterson. Five witnesses testified at the hearing. Twenty-one exhibits were received into evidence. Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing.

## JURISDICTION

Defendant was charged on August 13, 2014, in an Indictment with Attempted Commercial Sex Trafficking in violation of 18 U.S.C. §§ 1591(a)(1), 1591(b)(2), 1594(a) and 1594(d)(1). A Superseding Indictment was filed on May 19, 2015, charging the Defendant with an additional count, Attempted Enticement of a Minor Using the Internet in violation of 18 U.S.C. § 2422(b).

The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Honorable Jeffrey L. Viken's Standing Order dated March 9, 2015.

## FINDING OF FACTS

During the 2014, Sturgis Motorcycle Rally, the South Dakota Internet Crimes Against Children Taskforce (ICAC) performed a sex trafficking operation. Members of the taskforce posed as pimps advertising the sexual services of minors on the Internet in exchange for money. Special Agent John Kirk testified that he placed an advertisement on Craigslist, to which "alex c" responded, "I am in town and would love to see u . . . I also have epics." Exhibit 9. Undercover Special Agent Kirk replied to "[A]lex c" stating, "I got some girls who r good to go if you got some $. We got a 12, 13, and 15 year old who r all down and ready for anything." Exhibit 9. "[A]lex c" requested to see a picture of the 15 year old. Law enforcement emailed an age-regressed photograph of a female referred to as "Stef" and reiterated that "Stef" was 15[1] and inquired if "[A]lex c" had the money to pay. HT 129. "[A]lex c" inquired as to how much a blowjob would cost. "[A]lex c" then provided his phone number and requested the undercover Special Agent to contact him via text message. HT 130.

On August 5, 2014, the parties agreed upon $70 in exchange for oral sex. Exhibit 9A. "[A]lex c" claimed that the sex act was for his 17 year old cousin.

---

[1] Although the hearing transcript reflects that the government asked SA Kirk if "Steph" was the 16 year old fictional female, to which he confirmed it was, it appears that the government and SA Kirk misspoke, as Exhibit 9 reflects that "Stef" was advertised as a 15 year old.

Exhibit 9A.  The text messages establish that the parties agreed to meet 45 minutes later at the Common Cents convenience store on Junction Avenue in Sturgis.  HT 136, Exhibit 9A.  Undercover law enforcement informed "[A]lex c" that the "pimp" would be driving a black Nissan with Ohio plates.  HT 136.  "[A]lex c" said he would be driving 2014 Chrysler minivan with Saskatchewan plates.  HT 136.

Numerous law enforcement officers were involved with this operation.  There was a surveillance team, a take-down team, and Assistant Director for the South Dakota DCI, Dan Satterlee posed as the pimp.  There was a team operational meeting prior to the meeting with the defendant, wherein the events transpiring between "[A]lex c" and undercover law enforcement were discussed.  Members of this operation were communicating with each other continuously and relaying information to each other as it became available.  HT 18, 43.

Law enforcement had text messaging conversations back and forth with "[A]lex c" discussing when he would arrive; that he was on his way; that he was running late due to very heavy traffic; requesting that the "pimp" not leave; that he was almost there; and giving updates as to his location, including being a few blocks away, near the Taco Johns.  Ex. 9A.

Consistent with timing of the defendant's descriptions of his locations, a few minutes later, a blue[2] newer model Chrysler minivan with Saskatchewan plates pulled into the Common Cents store.  Agent Troy Boone, a member of

---

[2] The defendant had indicated that he would be driving a red Chrysler minivan.

the surveillance team, alerted other team members that he identified a blue van with Canadian plates pulling into the Common Cents parking and continuing to the agreed upon meeting area in the back parking lot.  HT 45, 141.  The undercover black Nissan was parked in the back of the Common Cents in a more remote area.  HT 35, 38.  There were only one or two other cars located in the back parking lot.  HT 23.  Although other parking spots were available, the Chrysler minivan with Saskatchewan plates pulled in and parked next to the black Nissan with Ohio plates.  HT 45, 79-80.  The vehicles were parked facing opposite directions, so that the passenger side doors were adjacent to each other.  HT 23-24.

Defendant Alexandros Thymaras (hereinafter Thymaras) exited his vehicle, walked around the back of his vehicle and toward the undercover vehicle.  HT 25.  Ass't Director Satterlee was seated in the driver's seat of the Nissan and was posing as the pimp.  Satterlee testified that it appeared as though Thymaras intended to approach him at the driver's side window.  HT 52.  Satterlee and Thymaras made eye contact with each other and Satterlee motioned for Thymaras to get into the black Nissan's passenger seat.  HT 25-26, 52.  When Thymaras stopped and looked at Satterlee, Satterlee motioned a second time, this time more exaggerated.  Ex. 1.  A review of the video supports Satterlee's testimony that it appeared that Thymaras intended to approach the driver's side door. Ex. 1.  Contrary to Thymaras' assertion, the video does not depict Thymaras headed to the convenience store or casino, and was only

stopped from doing so due to Satterlee's aggressive waiving. The video depicts a scene where two parties who agreed to meet, indeed meet.

Thymaras followed Officer Satterlee's instructions, opened the car door and seated himself in the front seat of Officer Satterlee's vehicle. Thymaras stated something to the effect of "How are ya buddy? Sorry, man weather's and this traffic and everything else." Ex. 1, Ex. 1A. At that point, the take down team arrived and placed Thymaras under arrest. HT 27, Ex. 1.

Immediately thereafter, Special Agent John Kirk and Special Agent Brett Spencer arrived on scene. HT 141. The blue Chrysler minivan driven by Thymaras was transported to the DOT shop where the contents were inventoried. HT 153. Thymaras was relocated to Agent Kirk's vehicle HT 144. Thymaras' handcuffs were repositioned to the front of his body and Thymaras was seat belted into Agent Kirk's vehicle. 144. Although, Agent Kirk could detect the odor of alcohol coming from Thymaras, he did not observe any signs of intoxication. HT 145, 206-261. Thymaras was transported a short distance to the State Department of Transportation to be interviewed. An audio recording of the interview was received into evidence as Exhibit 2. The audio recording establishes that prior to reading Thymaras his Miranda rights, law enforcement learned that he was from Canada. Ex 2. Agent Kirk could detect a Canadian accent, but had no trouble understanding Thymaras and had no indication that Thymaras had any difficulty understanding English or what was being said

Agent Kirk explained to Thymaras that they wanted to get Thymaras' "side of the story," but he first needed read him his rights, like "[he'd] probably heard 'em on TV." Thymaras responded with a very clear and audible, "Yeah" indicating familiarity with watching rights being read of television. Ex 2 at 5:27. Before reading the Miranda rights, Agent Kirk explained that if Thymaras had any questions, that Thymaras could stop him and have Agent Kirk reread something. Ex. 2. Agent Kirk then read the rights as follows:

> Before I ask you any questions you must understand your right, you have the continued right to remain silent and to stop questioning at any time. Anything you say can be used as evidence against you, you have the continued right to consult with and have the presence of an attorney and if you cannot afford an attorney, an attorney will be appointed for you.

Ex 2. When asked if Thymaras understood these rights, no audible response can be heard on the recording. However, Agent Spencer testified that Thymaras nodded his head indicating that he understood his rights. HT 260. Following up, Agent Kirk asked, "You do?" to which Thymaras nodded again. HT 260. When asked if Thymaras wished to waive his rights and talk to law enforcement, he stated, "Sure." Ex. 2.

Thymaras was questioned and subsequently transported to the Meade County Jail. Later that night around 11:35 p.m., Agent Kirk went to the jail to serve a search warrant upon Thymaras. HT 156. Thymaras asked to speak with the agents. Thymaras reiterated the facts previously revealed during the first interview and he asked the agents questions about the court procedures including bond and regarding contacting his consulate. HT 158. Agent Kirk

6

spoke to Thymaras regarding his right to talk to his consulate.  HT 158.  On August 11, 2014, Thymaras received incoming mail from the Consulate General of Canada.  HT 111, Ex. 14

## DISCUSSION

### I.  Whether probable causes existed to arrest Thymaras

A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime.  <u>Devenpeck v. Alford</u>, 543 U.S. 146 (2004).  Probable cause exists where the totality of the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed a crime.  There need only be a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity.  <u>United States v. Torres-Lona</u>, 491 F.3d 750, 755-756 (8th Cir. 2007).  There must be evidence which would "warrant a man of reasonable caution in the belief" that a crime has been committed.  <u>Wong Sun v. United States</u>, 371 U.S. 471, 479 (1963).

"To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause."  <u>United States v. Winarske</u>, 715 F.3d 1063, 1066 (8th Cir. 2013) *cert. denied*, 134 S. Ct. 1513, 188 L. Ed. 2d 452 (2014) (citing <u>Maryland v. Pringle</u>, 540 U.S. 366, 371, (2003). In making a probable cause determination, "[l]aw enforcement officers have substantial latitude in interpreting and drawing inferences from factual

circumstances." <u>United States v. Henderson</u>, 613 F.3d 1177, 1181 (8th Cir.2010).

Thymaras was initially arrested for a violation of SDCL § 22-24A-5(1), which is Solicitation of a Minor. Under state law, "a person is guilty of solicitation of a minor if the person eighteen years of age or older solicits a minor, or someone the person reasonably believes is a minor, to engage in a prohibited sexual act." SDCL § 22-24A-5(1). Here, an unknown person with the user name "[A]lex c" violated this statute by agreeing to pay $70 for oral sex from a 15 year old, whether it was for himself or for his 17 year old cousin. There was probable cause to believe that a crime had been committed. The remaining inquiry to be determined is whether probable caused existed to arrest Thymaras for the crime.

Thymaras argues that law enforcement lacked probable cause because they lacked any identifying information, such as a physical description of the defendant or what he was wearing. Thymaras also argues that Ass't Director Satterlee failed to have a "confirmatory conversation" with Thymaras to establish that Thymaras was "[A]lex c," the person law enforcement had been communicating with. Thymaras also argues that probable cause did not exist because the *blue* minivan only had one occupant and the 17 year old cousin was not present. Thymaras urges the court to look only to the testimony and actual knowledge of Satterlee, to determine whether probable cause existed because Satterlee made the call to arrest Thymaras.

In his brief, Thymaras claims that Satterlee's only basis for believing Thymaras was the suspect was 1) the remote location of the Common Cents parking lot; 2) the Saskatchewan license plate; 3) and visual confirmation of Thymaras looking at Satterlee. Doc. 66, p. 5. Thymaras asserts that Satterlee confirmed that there were no other factors that led him to make the arrest call. Thymaras claims that the only information Satterlee relied upon was his belief that he could "just tell" that Thymaras was "our guy." Doc. 66, pp. 5, 7. This is a mischaracterization of the record.

Satterlee testified that each member of the law enforcement team had different roles in the operation. HT 17-18. Satterlee received information from other team members regarding the identity and actions of the defendant. HT 18, 235. Satterlee testified that he made the call to arrest Thymaras based off of information from the surveillance team and members of the team who were contemporaneously chatting with Thymaras. HT 45.

Here, the facts known to law enforcement was that an individual known as "[A]lex c" had violated SDCL § 22-24A-5(1). "[A]lex c" agreed to meet the undercover pimp in 45 minutes in the Common Cents parking lot. "[A]lex c" identified his vehicle as a red 2014 Chrysler minivan with Saskatchewan plates. "[A]lex c" advised that he was running late due to heavy traffic. "[A]lex c" gave real time updates as to his location, including being at Taco John, which is a few blocks away from Common Cents. "[A]lex c" was told to meet the undercover pimp in the back parking lot where the undercover pimp would be in a black Nissan. A few minutes later and consistent with the location

updates, members of the surveillance team observed a blue newer model Chrysler minivan with Canadian plates containing a single occupant drive around to the back parking lot and park immediately adjacent to the black Nissan. The sole occupant, appearing over the age of 18, exited his mini-van and walked behind his vehicle in the direction of the black Nissan. He made eye content with the driver of the black Nissan and when the driver waived toward the passenger seat of the black Nissan, the suspect opened the passenger door and seated himself in the car. Upon entering the car, the suspect informed the undercover pimp that he was sorry that he was late and that the traffic was tough, which was consistent with the conversations that "[A]lec c" was having with law enforcement.

Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. Maryland v. Pringle, 540 U.S. 366, 371 (2003). The reasonable conclusion to be drawn is that the driver of the blue Chrysler minivan was the same person participating in email and text messaging setting up the details of the illegal sexual encounter. The reasonable conclusion is that Thymaras came to the Common Cents, believing the driver of the black Nissan was the pimp he had been communicating with, as established by Thymaras' willingness to get into the car and greet the occupant with a friendly banter and reiterating conversations which he previously had over text messaging, to-wit; that he was running late and he was sorry.

Ass't Director Satterlee's subjective intent, even accepting Thymaras' argument that it was solely that Thymaras was "just our guy," is no basis for invalidating an arrest.  Davenpeck v. Alford, 543 U.S. 146, 594 (2004).  "The fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."  Whren v. United States, 517 U.S. 806, 813 (1996) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)).

Furthermore, the fact that the minivan was blue, instead of red; that the 17 year old cousin wasn't present; and the uncertainty of whether the surveillance team identified that the licenses plate specifically Saskatchewan or just an Canadian license plate, does not invalidate the arrest.  While this evidence, when viewed under the totality of the circumstances, tends to negate the possibility that the Thymaras was the person who committed the crime, it is not enough to outweigh the other substantial corroborating evidence. An officer "faced with conflicting information that cannot be immediately resolved" may still have probable cause and "need not conduct a 'mini-trial' before effectuating an arrest." Galarnyk v. Fraser, 687 F.3d 1070, 1075 (8th Cir. 2012) (quoting Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir.1999)).

Thymaras also argues that law enforcement's failure to have a "confirmatory conversation" to verify Thymaras' intent to pay for a minor to engage in a sex act invalidates the arrest.  In support thereof, Thymaras implies that United States v. Jungers, 702 F.3d 1066 (8th Cir. 2013), provides

guidance for future government prosecutions in sex trafficking cases by suggesting that a confirmatory conversation is required. This is a misstatement of the law. <u>Jungers</u> solely addressed the issue of whether 18 U.S.C. § 1591 applies to both suppliers and consumers of commercial sex acts. There was no analysis of probable cause or whether a confirmatory conversation must take place. Simply because the facts of the <u>Jungers</u> case involve an arrest after the defendants confirmed that they would pay to have sex with minors, it does not follow that the well-established totality of the circumstances test is modified to include a confirmatory conversation requirement. Thymaras cites no other authority in support of his position.

Instead, the totality of the circumstances guides the court's analysis. Based on this approach, sufficient objective facts existed at the time of Thymaras' arrest to support the belief that he committed a crime, thus amounting to probable cause.

## II. Whether Thymaras' statements must be suppressed because the waiver of his Miranda rights was not knowing and voluntary and because law enforcement violated his Vienna Convention rights.

Thymaras is a dual citizen. He is a citizen of the United States and he is a citizen of Canada. Shortly after Thymaras was placed under arrest, it became apparent that he was a Canadian citizen from his Canadian passport, cell phone number, and informal discussions Thymaras had with the agents. Thereafter, Thymaras was read his Miranda rights and a custodial interview took place. Thymaras seeks to suppress his statements.

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. United States v. Phillips, 540 F.2d 319 (8th Cir.1976) cert. denied, 429 U.S. 1000 (1976). The Government, however, bears the burden of proving by a preponderance of the evidence that Miranda warnings were either not necessary or that they were given and effectively waived. Miranda v. Arizona, 384 U.S. 436, 475 (1966); United States v. Short, 790 F.2d 464, 467-68 (6th Cir. 1986); United States v. Charbonneau, 979 F.Supp. 1177, 1181 (S.D. Ohio 1997). The government's burden of proof is a preponderance of the evidence standard. Colorado v. Connelly, 479 U.S. 157,168 (1986).

Thymaras argues that he did not knowingly or intelligently waive his Miranda rights because he is a citizen of both Canada and the United States, but spent his entire life in Canada. Doc. 66, p. 3. Thymaras contends that he is "predominantly Canadian" and should have been treated as a Canadian national for purposes of Consular notification. He alleges that his Vienna Convention rights were violated by not having an opportunity to contact the Canadian Consulate before questioning as he alleges is mandated by the Vienna Convention. Doc. 52, p. 25. He claims that he should have been informed of this right so he could have contacted the consulate prior to being informed of and waiving his Miranda rights.

The government argues that Thymaras received an adequate Miranda warning because he primarily speaks English, he did not demonstrate difficulties communicating with the agents, he was given the opportunity to ask questions and chose not to, and he never asked the agent to slow down while

conveying the warning. Doc. 67, p. 22. The government also claims that
Thymaras is not entitled to the protections of the Vienna Convention because
of his United States Citizenship. Even if he were entitled to the Vienna
Convention protections, the agents informed Thymaras of his right to contact
the consulate post-questioning. Furthermore, the government claims that the
remedy for a violation of the Vienna Convention is not suppression.

    **A.**    **Whether the Vienna Convention is applicable to Thymaras and
if a violation thereof, requires suppression.**

Article 36 of the 1963 Vienna Convention on Consular Relations
"requires authorities to inform detained or arrested foreign nationals that they
may have their consulates notified of their status. <u>United States v. Santos</u>, 235
F.3d 1105, 1107 (8th Cir. 2000). This article states:

1. With a view to facilitating the exercise of consular functions relating to
nationals of the sending State:

    a) consular officers shall be free to communicate with nationals of
the sending State and to have access to them. Nationals of the
sending State shall have the same freedom with respect to
communication with and access to consular officers of the
sending State;

    b) if he so requests, the competent authorities of the receiving
State shall, without delay, inform the consular post of the
sending State if, within its consular district, a national of that
State is arrested or committed to prison or to custody pending
trial or is detained in any other manner. Any communication
addressed to the consular post by the person arrested, in
prison, custody or detention shall be forwarded by the said
authorities without delay. The said authorities shall inform the
person concerned without delay of his rights under this
subparagraph;

    c) consular officers shall have the right to visit a national of the
sending State who is in prison, custody or detention, to
converse and correspond with him and to arrange for his legal

representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgement. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this article are intended.

Vienna Convention on Consular Relations, Art. 36(b), April 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

In the Department of State's Consular Notification and Access Manual (last revised March 2014), the Department advises that

A person who is a U.S. Citizen and a national of another country may be treated exclusively as a U.S. citizen when in the United States. In other words, consular notification is not required if the detainee has U.S. citizenship, regardless of whether he or she has another country's citizenship or nationality as well. This is true even if the detainee's other country of citizenship is a mandatory notification…country. As a matter of discretion, however, the Department of State suggests that, when possible, you permit a visit from the consular officers of the detainee's other country of nationality, as long as the detainee requests a visit and wishes to be visited by those consular officers.

It is "a recognized fact of international law that a dual national is never entitled to invoke the protection or assistance of one of the two countries while in the other country." United States v. Matheson, 400 F. Supp. 1241, 1245 (S.D.N.Y. 1975) (United States Citizen who married a Mexican Citizen and who thought she held dual citizenship with Mexico applied for and received a Mexican certificate of nationality in which she "renounced all protection" of foreign laws; this was merely a statement of international law and not a

renunciation of U.S. citizenship) (citing <u>Nishikawa v. Dulles</u>, 356 U.S. 129 (1958); <u>Kawakita v. United States</u>, 343 U.S. 717 (1952)).

Though the Vienna Convention provides a right to consular notification, it is an "open question" whether the treaty creates a privately enforceable right in federal court. <u>United States v. Rumbo-Rosendiz</u>, Crim. No. 01-186 (JRT/FLN), 2001 U.S. Dist. LEXIS 25106, *17 (D. Minn. Nov. 26, 2001) (citing <u>United States v. Minjares-Alvarez</u>, 264 F.3d 980, 986 (10th Cir. 2001)); <u>see also, e.g.</u>, <u>United States v. Santos</u>, 235 F.3d 1105 (8th Cir. 2000) (avoids deciding whether Article 36 of the Vienna Convention creates an individually enforceable right in federal court and outlines the circuit split).

Thymaras asserts that <u>Napier-El/Bey v. Johnson</u>, Civil Action No. 2:05CV521, 2006 WL 1582414 (E.D. Va. June 1, 2006) is indicative of the standard that courts use to determine whether a dual national defendant is entitled to consular notification. Napier-El/Bey, a dual national of the United States and Morocco, was tried and convicted for first degree murder, robbery, abduction, and use of a firearm. Eventually, he filed a federal petition for habeas corpus pursuant to 28 U.S.C. §2254 alleging that authorities failed to inform him of his rights to consular assistance pursuant to Article 36 paragraph 1(b) of the Vienna Convention. The court did not reach the merits of the petition because it found the petition was barred by the statute of limitations.

In a footnote, the court mentioned that an International Court of Justice Case <u>Avena and Other Mexican Nationals (Mexico v. United States)</u>, 2004 I.C.J.

12 (March 31, 2004), "seemed to suggest" that Napier-El-Bey "could only assert rights under the Vienna Convention if his Moroccan nationality was his 'predominant nationality.'" Napier-El/Bey, Civil Action No. 2:05CV521 at FN 24. Because he did not provide proof of his Moroccan nationality before his conviction was finalized, Napier-El-Bey could not have been considered predominantly Moroccan at the time of trial. Thus, his Vienna Convention rights could not have been violated. The International Court of Justice never reached the question of whether the Vienna Convention applies to an individual with dual-citizenship who is tried in one of their home countries.

In Buenaventura v. Burt, No. C07-0034, 2008 WL 4174910 (N.D. Iowa Aug. 29, 2008) a citizen of the Philippines was accused of murder and claimed in his habeas petition that his Vienna Convention rights were violated because law enforcement was aware of his nationality and did not advise him of his right to consular notification. The court determined that his waiver was voluntary and that whether a defendant is told of his right to consular notification is one factor weighing against the voluntariness of his statements that must be considered in the totality of the circumstances.[3]

The case of United States v. Karbedeh, Crim. No. 10-62 (DSD/JJK), 2010 WL 3521984 (D. Minn. Aug. 11, 2010), involved three Liberian citizens' motion to suppress statements. One defendant was unfamiliar with the United States criminal justice system and did not speak English as a first language. He

---

[3] This can also be seen in United States v. Amano, 229 F.3d 801 (9th Cir. 2000), where a citizen of Japan had not been informed of his consular notification right and this violation was not fatal to the determination that the defendant ultimately did voluntarily waive his Miranda rights. 229 F.3d at 805.

voluntarily waived his <u>Miranda</u> rights after signing a waiver form. There was no evidence that he did not understand the rights he was read, that he could not read or understand English, or that he could not understand the concepts communicated to him. Additionally, there were no other facts suggesting coercive tactics to make the statements involuntary. Another defendant, also a Liberian citizen, claimed that if he had known of his right to contact the Liberian Consulate, he would have done so. The court stated that it is not clear that the Vienna treaty creates rights that are privately enforceable in federal court. The defendant did not show that he was prejudiced by the failure to be advised of his rights under the Convention, aside from conclusory statements that the Liberian Consulate would have responded helpfully. <u>Id</u>. at *13 (citing <u>United States v. Santos,</u> 235 F.3d 1105, 1107 (8th Cir. 2000) (presuming a requirement of prejudice if there is an individually enforceable right under the Convention). Thus, the court denied this motion to suppress.

Finally, the Eighth Circuit in <u>Santos</u> considered an appeal of a Mexican National who claimed a violation of the Vienna Convention because he was not notified of his consular notification right until four days after arrest and after waiving <u>Miranda</u>. 235 F.3d 1105 (8th Cir. 2000). The appellate court considered whether this violation of the Vienna Convention should result in the defendant's conviction being invalidated. The court answered that question in the negative and ruled that, at most, law enforcement's failure to inform the defendant of his right to consular notification was harmless error. The defendant was informed five months before trial and had an opportunity to

contact the consulate any time before trial. Additionally, all of the other evidence used against the defendant at trial was weighty and the defendant did not provide a credible explanation for the evidence against him. Thus, admitting the statements was harmless beyond a reasonable doubt.

Whether Thymaras has an enforceable right under the Vienna Convention, does not require an answer because at least seven circuits have determined that, even if such a right exists, defendants would not be entitled to suppression of their statements. See Rumbo-Rosendiz, supra, at 18-19 (citing United States v. Minjares-Alvarez, 264 F.3d 980, 986 (10th Cir. 2001); United States v. Jimenez-Nava, 243 F.3d 192 (5th Cir. 2001); United States v. Page, 232 F.3d 536 (6th Cir. 2000); United States v. Chaparro-Alcantara, 226 F.3d 616 (7th Cir. 2000); United States v. Cordoba-Mosquera, 212 F.3d 1194 (11th Cir. 2000); United States v. Lombera-Camorlinga, 206 F.3d 882 (9th Cir. 2000) (en banc); United States v. Li, 206 F.3d 56 (1st Cir. 2000) (en banc)).

Even if Thymaras had a right to consular notification prior to his custodial interview, then similar to the defendant in Santos, he suffered no violation because he still has a chance to contact the Canadian consulate. Additionally, Thymaras would not be entitled to suppression of the evidence if that right was violated. Therefore, we turn to the remaining issue of whether Thymaras' Miranda waiver was voluntary considering the totality of the circumstances, potentially including the extra Garibay foreign national factors.

**B.    Sufficiency of <u>Miranda</u> warnings**

Case law is sparse on the issue of what warnings are sufficient in order for a dual citizen to knowingly and intelligently waive his <u>Miranda</u> rights. There are two cases outside of the Eighth Circuit that address the question of what is required for a foreign citizen to voluntarily waives <u>Miranda</u> rights. Other cases, some in the Eighth Circuit, merely discuss <u>Miranda</u> in the context of an individual whose primary language is not English. The nationality of the individual in those cases was not disclosed.

The factors which courts consider in deciding whether a foreign national voluntarily waived his <u>Miranda</u> rights are "whether the defendant signed a written waiver; whether the advice of rights was in the defendant's native language; whether the defendant had the assistance of a translator; whether the defendant's rights were explained painstakingly; and whether the defendant had experience with the American criminal justice system." <u>United States v. Garibay</u>, 143 F.3d 534, 538 (9th Cir. 1998) (no voluntary waiver where defendant primarily spoke Spanish and had a low verbal IQ). Courts must still consider the totality of the circumstances. <u>Id</u>.

The Ninth Circuit considered a case where a Japanese citizen was accused of manufacturing and using counterfeit currency and claimed he did not voluntarily waive his <u>Miranda</u> rights. <u>United States v. Amano</u>, 229 F.3d 801 (9th Cir. 2000). The Japanese citizen claimed that he was advised his rights in English, he did not have the assistance of an interpreter, he lacked experience with the United States criminal justice system, and he was not informed of his

right to contact the Japanese consulate. Id. at 804. The court detailed the factors set out in Garibay and found that the defendant had sufficient English skills to understand the rights told to him. Law enforcement perceived defendant's ability to converse in English and the defendant had many English-language materials in his home. Law enforcement also read him his rights twice (once before questioning and once before signing a consent to search form) and the defendant appeared to understand his rights. Though the defendant submitted an affidavit claiming that he would have contacted the Japanese consulate if he had been told he had a right to do so, the court found this affidavit unpersuasive "because it was 'conclusory, self-serving, and not subject to cross examination.'" Id. at 805. Because of these factors, the Japanese citizen's lack of experience with the United States justice system and lack of contact with the consulate were not enough to make his waiver involuntary.

A case from the Middle District of Louisiana, United States v. Barry, found that a citizen of Guinea and a lawful permanent resident in the United States did not voluntarily waive his Miranda rights. 979 F.Supp.2d 715 (M.D. La. 2013). The court considered the foreign national factors from Garibay and found that the defendant did not receive the warnings in his native language (Fulani), did not have the assistance of a translator, and was not "individually and repeatedly" read his rights. Though the defendant was provided with and appeared to read the Miranda waiver form, the agent interviewing him did not

ask whether the defendant could read or understand what he read. Id. at 719. His understanding of the waiver was assumed, but not confirmed. Id.

With regard to Eighth Circuit cases considering Miranda in the context of non-English speaking defendants, the courts consider whether the defendant could comprehend the instruction he was given in the language in which he was addressed and whether there are other factors in the totality of the circumstances analysis so as to find the waiver voluntary or involuntary. See e.g., United States v. Castro-Higuero, 473 F.3d. 880 (8th Cir. 2007) (Spanish speaking defendant knowingly, voluntarily, and intelligently waived Miranda rights when provided with a translator over the phone, stated that he understood his rights and wanted to make statements, sought clarification of one of the agents statements, and gave no indication that he intended to stay silent); United States v. Morales, No. CR10-3055, 2011 WL 797330 (N.D. Iowa Feb. 14, 2011) (Defendant whose first language was Spanish voluntarily waived his Miranda rights when he stated he did understand English, gave "lengthy answers to open ended questions," never said he could not understand the questions or wanted an interpreter, and gave responsive answers to the officers' questions); United States v. Herrera, No. 07-CR-47 (PAM/SRN), 2007 WL 1542553 (D. Minn. Apr. 10, 2007) (Spanish speaking defendant knowingly, voluntarily, and intelligently waived his Miranda rights when he told law enforcement that he spoke "some English," told the agent that he understood the Miranda waiver form and signed it, did not express any lack of understanding, did not ask the agent to stop the interview, did not ask to

speak with a lawyer, and the experienced agent testified that defendant answered questions appropriately and in context).

Here, Agent Kirk informed Thymaras:

> Before I ask you any questions you must understand your rights, you have the continued right to remain silent and to stop questioning at any time. Anything you say can be used as evidence against you, you have the continued right to consult with and have the presence of an attorney and if you cannot afford an attorney an attorney will be appointed for you.

Ex. 2, 2A. <u>Miranda</u> warnings protect an individual's Fifth Amendment privilege against self-incrimination by "ensuring that a suspect knows that he may choose not to talk to law enforcement, to talk only with counsel present, or to discontinue talking at any time." <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987).

A wavier of one's <u>Miranda</u> rights may be either express or implied. <u>Berhuis v. Thompkins</u>, 560 U.S. 370, (2010) (citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-76 (1979)). An implied waiver occurs when the suspect embarks on a course of conduct indicating waiver, given the totality of the circumstances. <u>Id.</u> The government must show that the suspect was advised of his <u>Miranda</u> rights, understood those rights, and then chose to make an uncoerced statement. <u>Id.</u> at 2261-62. Simply proving that a <u>Miranda</u> advisement was given and that a statement was later made is not sufficient. <u>Id.</u> Although the advisement itself is formalistic, the waiver need not be formalistic and the waiver need not comply with the procedures set out in Fed. R. Crim. P. 11 for waiver of an accused's rights to trial in open court during a plea proceeding. <u>Id.</u> at 2262.

Whether a suspect effectively waived <u>Miranda</u> requires two inquires:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Jones, 23 F.3d at 1313. Examination of the totality of the circumstances includes, but it not limited to, such considerations as the "background, experience, and conduct" of the defendant. Id. (quoting United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993)).

"As a general matter ... an accused who is admonished with the warnings prescribed by this Court in Miranda has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one..." United States v. Garlewicz, 493 F.3d 933, 936 (8th Cir. 2007). "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." Moran, 475 U.S. at 422-423.

Assuming without deciding, that Thymaras must be treated as a foreign citizen and is entitled to the application of the Garibay factors, Thymaras was

given adequate warnings. Although Thymaras wasn't presented with a written warning or a written waiver, the other factors weigh heavily in favor of knowing and voluntary consent. The warnings were given in his native English language by native English speaking agents, thus negating the need for a translator. Thymaras appeared familiar with the concepts of search warrants and discussed giving consent to allow law enforcement access to his email accounts. He indicated a familiarity of <u>Miranda</u> rights by agreeing that he had watched them being read on television. Thymaras previously had been in contact with law enforcement in Arizona regarding harassing messages he received and had two attorneys from Canada involved with a defamation lawsuit he was pursing.

Prior to the warning being read, Agent Kirk informed Thymaras, "I'm gonna read this to you, if you have any questions when I got through this with you, you can just tell me and, of if you want me to stop and reread somethin', let me know. . ." Ex. 2, 2A. Agent Kirk testified that Thymaras never asked him to re-read any portion of the rights and never indicated that he was confused. There are no facts to suggest he could not comprehend the warnings. Although there was an order of alcohol on Thymaras, there was no evidence of intoxication. Agent Boone testified that Thymaras nodded his head twice indicating that he understood his rights. HT 260. In response to Agent Kirk's question, "Do you wish to waive these rights and talk to the two of us at this time?" Thymaras replied, "Sure." Ex. 2, 2A. During the interview, Thymaras gave lengthy answers to open ended questions and demonstrated

that he was aware of everything that was happening.  In fact, he challenged the agents' tactics by informing them that they were good at their job, but that he wouldn't change his story to say what they wanted him to say.  Thymaras had a clear understanding of his rights.

Thymaras argues that the reading of the <u>Miranda</u> rights was insufficient because it failed to inform him that his statement could be used against him *in court*.  This argument is without merit.  The Eighth Circuit has previously rejected this argument in <u>United States v. Castro-Higuero</u>, 473 F.3d 880, 886 (8th Cir. 2007)(holding that the defendant's argument he did not know the full extent of his rights because the interpreter only informed him that anything he said could be used against him, instead of informing him that anything he said could be used against in *in court* was without merit).

The totality of the circumstances establish that Thymaras was properly informed of his <u>Miranda</u> rights and that he knowingly and voluntarily waived those rights.

### III.    Whether evidence obtained during the inventory search must be suppressed.

Motions to suppress evidence "must be raised before trial."  Fed. R. Crim. P. 12(b)(3)(C).  Fed. R. Crim. P. 12(c) permits the Court to set deadlines for filing pretrial motions.  Pursuant to the court's Scheduling Order dated March 4, 2015 (Doc. 50), the deadline for suppression/voluntariness motions was March 11, 2015.  Thymaras filed the pending motion to suppress on March 11, 2015.  The only issues raised were those as previously outlined and discussed in this report and recommendation.  For the first time, in his post hearing reply

brief, Thymaras argued that evidence obtained from the warrantless inventory search of his vehicle.

Fed. R. Crim. P. 12(c)(3) provides that "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause. Thymaras failed to move the court for an extension or to reopen the evidentiary hearing to address this newly raised issue. Having failed to show good cause, the court will not consider whether evidence obtained during the inventory search should be suppressed.

## **CONCLUSION**

Based on the foregoing facts, law and analysis, this court respectfully recommends that Mr. Thymaras' motion to suppress (Doc. 51) be denied in its entirety.

## **NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 25th day of August, 2015.

BY THE COURT:

_____
DANETA WOLLMANN
United States Magistrate Judge