UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ALEXANDROS THYMARAS,<br><br>Defendant. | CR. 14-50063-JLV<br><br>ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING MOTION TO SUPPRESS |

On August 13, 2014, a grand jury indicted Alexandros Thymaras for attempted commercial sex trafficking in violation of 18 U.S.C. §§ 1591(a)(1), 1591(b)(2), 1594(a) and 1594(d)(1).[1]   (Docket 1).   On March 11, 2015, Mr. Thymaras filed a motion to suppress.   (Docket 51).   The motion seeks to suppress "[a]ll physical evidence and statements obtained incident to Defendant's August 5, 2014 arrest . . . [and] . . . "[d]efendant's post-arrest recorded interrogation conducted by law enforcement officers . . . ."   Id. at p. 1. The motion to suppress was referred to United States Magistrate Judge Daneta Wollmann pursuant to 28 U.S.C. § 636(b)(1)(B) and the standing order of March 9, 2015.   An evidentiary hearing was held on April 23, 2015, through April 24, 2015.   (Docket 64).   On August 25, 2015, Magistrate Judge Wollmann issued a report and recommendation ("R&R").   (Docket 82).   The defendant timely filed

---

[1]On May 19, 2015, a superseding indictment was filed charging Mr. Thymaras with an additional count of attempted enticement of a minor using the internet in violation of 18 U.S.C. § 2422(b).   (Docket 69).   The superseding indictment is the subject of a separate defense motion which is not relevant to this analysis and which will be dealt with by a separate order.

objections to the report and recommendation.   (Docket 87).   The government filed no objections to the report and recommendation, but filed a response to the defendant's objections.   (Docket 94).   The defendant filed an objection to the government's response.   (Docket 98).   Mr. Thymaras' objection seeks leave to file a reply if the court considers the government's response.   Id. at p. 2.   Mr. Thymaras' procedural objection will be resolved by this order.

Under the Federal Magistrate Act, 28 U.S.C. § 636(b)(1), if a party files written objections to the magistrate judge's proposed findings and recommendations, the district court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."   Id.   The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."   Id.

**FACTUAL OBJECTIONS**

The defendant objects to the following facts as found by the magistrate judge:

1. It was a "mischaracterization of the record" for Thymaras to assert that DCI Assistant Director Dan Satterlee "confirmed that there were no other factors that led him to make the arrest call" other than: 1) the remote location of the take-down site; 2) the Saskatchewan license plates on Thymaras' vehicle; and 3) visual confirmation of Thymaras looking at Agent Satterlee.   (Docket 87 at p. 6).

2. [T]hat Thymaras parked, and was arrested, in a "remote area."   Id. at p. 7.

2

3. "Agent Troy Boone, a member of the surveillance team, alerted other team members that he identified a blue van *with Canadian* plates" pulling into the parking lot at the take-down site.   Id. (emphasis added in objection).

4. [T]hat it is a mischaracterization of the record to conclude that Agent Satterlee did not make visual contact of Thymaras before calling for his arrest.   Id.

5. [T]hat, during his post-arrest interrogation, Thymaras "indicat[ed] familiarity with watching [Miranda [2]] rights being read of [sic] television."   Id.

6. [T]hat "Thymaras was transported a short distance to the State Department of Transportation to be interviewed," implying that the interrogation occurred within the confines of the building.   Id.

7. [T]hat Thymaras "walked around the back of his vehicle and toward the undercover vehicle."   Id. at p. 8.

8. [That] [t]he R&R omits when in the sequence of events Agent Satterlee called for the arrest[.]   Id.

9. [T]hat Agent Satterlee had "team" information regarding the Thymaras' identity prior to calling for his arrest.   Id.

Each of defendant's objections will be separately addressed in categories which make sense chronologically with the evidence presented at the suppression hearing.

PROBABLE CAUSE FOR ARREST

During the Sturgis Motorcycle Rally in 2014, the South Dakota Internet Crimes Against Children Taskforce was working a sex trafficking operation. (Docket 82 at p. 2).   Posing as pimps, members of the taskforce advertised on

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

the internet they had minors who were available for sexual services for money. Id.

Working undercover on August 3, 2014, Special Agent Jonathan Kirk placed an advertisement on Craigslist, to which "alex c" responded, "I am in town and would love to see u . . . I also have epics."[3] Id. (referencing suppression hearing Exhibit 9).   Agent Kirk replied: "I got some girls who r good to go if you got some $.   We got a 12, 13, and 15 year old who r all down and ready for anything." Id. (referencing Exhibit 9).   "Alex c" asked to see a picture of the 15-year-old. Id.   An age-regressed photograph of a female referred to as "Steph" and identified as the 15-year-old was e-mailed to "Alex c" on the late afternoon of August 4, 2014.   (Exhibit 9 at p. 2).   The e-mail asked if he had money to pay. Id.

Prior to meeting with "Alex c" law enforcement held an operational meeting.   (Docket 82 at p. 3).   Assistant Director of the South Dakota Division of Criminal Investigation ("DCI") Dan Satterlee was to pose as a pimp and a number of other officers were working as a surveillance team and an arrest team, referred to as the "take-down team." Id.   Another law enforcement officer was assigned the task of conducting on-line communications with "Alex c."   (Docket 64 at pp. 17:22-18:4).   As information was gathered during the operation each

---

[3]All exchanges between Agent Kirk, Agent Russell and "Alex c" are presented in their original form.

4

member of the law enforcement team communicated by radio with the other members of the team.   (Docket 64 at p. 18:5-9).

At 10:19 a.m. on August 5, 2014, after receiving the photograph of Steph, "Alex c" replied "yes that works this is for my cousin and how much money do u need for a quick blowjob from stef."   (Exhibit 9 at p. 2).   "Alex c" then provided his phone number and asked the pimp to contact him via text message.   Id. at p. 3.

During the 2014 Sturgis Rally, Junction Avenue was a "very high traffic area" and the Common Cents store had a "considerable amount of traffic." (Docket 64 at p. 20:2-15).   Once the decision to meet with "Alex c" at the Common Cents was set, Agent Satterlee parked his black Nissan Maxima with Ohio license plates in the back parking lot on the west side of the convenience store.   Id. at    p. 21:1-11.   This was a dirt parking lot with an "open parking area" and no designated parking slots.   Id. at p. 23:14-17.   Agent Satterlee was parked away from the building facing east and was the only vehicle in that particular parking lot.   Id. at p. 23:18-23.   He described the area of the west parking lot as "relatively remote."   Id. at p. 38:22-23.

Shortly after 4:21 p.m. on August 5, 2014, Agent Toby Russell, posing as the pimp, and "Alex c" agreed via text messaging on a price of $70 for oral sex.[4] (Docket 64 at p. 122:1-12 & Exhibit 9A at pp. 1-3).   "Alex c" indicated the sex act

---

[4]All subsequent communications with "Alex c" occurred via text messaging until the point of arrest.

was for his 17-year-old cousin.   (Exhibit 9 at p. 1 & Exhibit 9A at p. 1).   Agent
Russell and "Alex c" agreed to meet in 45 minutes at the Common Cents store on
Junction Avenue in Sturgis, South Dakota.   (Exhibit 9A at p. 3).   "Alex c" was
informed the pimp would be driving a black Nissan with Ohio plates.   Id.   "Alex
c" indicated he would be driving a 2014 Chrysler minivan with Saskatchewan
license plates.   Id.   "Alex c" asked "where we going[?]"   Id. at p. 7.   In
response, "Alex c" was advised he would be given the location of Steph once he
and the pimp met.   Id.   "Alex c" texted back "So there is no way this girl can ran
into our car and do this for 10 min and go[?]"   Id.   The response back was "Ok
dude I gotta make sure u not a cop.   She is not far away from Common Cents so
once we meet and I know u legit I will go get her and bring her to u.   The rules
are u can't hurt her or scare her.   I cant have her brused up or nothing."   Id.
"Alex c" replied "No way that won't happen and its not me its me cousin who is
still a virgin..just a bare back blowjob for 70."   Id.

Agent Russell sent out a few more general text messages regarding Steph's
location and at 5:28 p.m. asked for "Alex c's" estimated time of arrival.   Id. at
p. 5.   Twenty-four minutes later, "Alex c" responded "12 min."   Id. at p. 8.   The
two exchanged brief text messages until Agent Russell texted "I am nervous bout
u."   Id.   "Alex c" replied "Don't be I just got to my car and trying to get offmain
drive to come o u."   Id.   The remainder of their text message exchanges were:

Agent:                         What color u van so I know its u

Alex c:                        Red Are u there

6

| | |
|---|---|
| Agent: | yes |
| Alex c: | On the way please wait |
| Agent: | is traffic bad? |
| Alex c: | Very please don't go |
| Agent: | No worries I will wait |
| Alex c: | Almost there |
| Agent: | Ok |
| Alex c: | What are u driving |
| Agent: | Black Nissan Ohio plates |
| Alex c: | See u in 2 min |
| Agent: | Ok |
| Alex c: | Here |
| Agent: | Where?   I don't see u |
| Alex c: | Is it junction and what? |
| Agent: | Junction and Glover across from the Ford car lot Where u at. Maybe I come to u |
| Alex c: | I am at taco Johns right now on juncation |
| Agent: | I am just down the street from there so u come to me |

Id. at pp. 9-10.

Agent Satterlee, while working in the undercover role as the pimp, received updated information on his radio from the other agents.   (Docket 64 at pp. 18:10-13; 22:21-23 & 43:4-11).   Agent Satterlee was notified by a member of the

7

surveillance team, Agent Boone, who was stationed on the east side of the Common Cents, that a blue, not red, Chrysler minivan had pulled into the front parking lot, stopped briefly and was coming around to the back of the building. Id. at p. 23:2-5; see also Exhibits 1 & 1A at p.1.   Agent Boone read the license plate and provided all team members with a partial number from the plates. (Exhibits 1 & 1A at p. 1).   The surveillance team indicated there was only one visible occupant in the minivan.   (Docket 64 at p. 24:20-21; see also Exhibits 1 & 1A at p.1).   Agent Satterlee understood from the information conveyed by the surveillance team that this was the individual they had been communicating with and he was now pulling around to the back of the store.   Id. at p. 77:10-15.

The subject vehicle pulled up next to Agent Satterlee's automobile and faced west so that their passenger doors were next to each other.   Id. at pp. 23:23-24 & 24:15-17.   It was at this point in time that Agent Satterlee announced to the law enforcement team "That's our guy. . . . Disneyland, Disneyland."   Id. at 34:5-22; see also Exhibit 1 & 1A at p. 1.   "Disneyland" was chosen as the code word for the team's signal to make an arrest.   (Docket 64 at p. 34:16-20).   The driver was still in the minivan at the moment Agent Satterlee made the determination to initiate an arrest.   Id. at p. 34:12-20 & 35:3-4.

Mr. Thymaras[5] got out of the minivan, came around the back corner of his vehicle, stopped very briefly and made eye contact with Agent Satterlee.   Id. at

---

[5]The driver's name was not known by law enforcement until after the arrest was effectuated and the initial interview occurred.   (Exhibit 2 & 2A at pp. 1-2).

pp. 25:10-12 & 26:6-8.    Agent Satterlee gestured to get into the vehicle with him.[6]   Id. at p. 25:15-16.    The agent felt comfortable waving him into the vehicle because the suspect was wearing shorts and a T-shirt and the agent was confident the suspect was not carrying a firearm.    Id. at pp. 50:24-51:6.    When Mr. Thymaras looked at the agent again, Agent Satterlee made a second gesture indicating the suspect should get into the passenger seat of the agent's vehicle. Id. at p. 26:8-10.    Mr. Thymaras opened the door and sat down in Agent Satterlee's vehicle.    Id. at p. 41:6-6 & Exhibit 1.

Once inside the agent's vehicle, Mr. Thymaras spoke first, asking "How are ya buddy?"  (Exhibit 1A at p. 1).    Agent Satterlee replied "Good" and Mr. Thymaras said "Sorry man weather's . . . and . . . This traffic and everything else." Id.   Agent Satterlee instructed Mr. Thymaras to put his hands up on the dash. Id.   Once the arrest team arrived moments later, Mr. Thymaras was removed from the vehicle, placed on the ground and handcuffed.    (Exhibit 1).

This is the point at which the arrest was effectuated.    "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."   United States v. Jones, 535 F.3d 886, 890 (8th Cir. 2008) (quoting Devenpeck v. Alford, 543 U.S. 146, 152 (2004)).    While Agent Satterlee had

---

[6]The pre-arrest plan was that for officer safety the suspect would not be allowed to enter Agent Satterlee's vehicle.   Id. at pp. 16:8-18 & 25:24-26:1.

probable cause to arrest Mr. Thymaras while he was still in the minivan, the arrest was not effectuated until after the conversation occurred in the agent's vehicle.   Mr. Thymaras' apologies for being late because of traffic is consistent with what had been conveyed to the law enforcement team by "Alex c" and his arrival was consistent with the timing of the text messaging.   Based on the totality of the circumstances, "the officers had probable cause to effectuate the arrest . . . ."   <u>United States v. Martinez</u>, 462 F.3d 903, 907 (8th Cir. 2006).

<u>Defendant's Objections</u>:

1. It was a "mischaracterization of the record" for Thymaras to assert that DCI Assistant Director Dan Satterlee "confirmed that there were no other factors that led him to make the arrest call" other than: 1) the remote location of the take-down site; 2) the Saskatchewan license plates on Thymaras' vehicle; and 3) visual confirmation of Thymaras looking at Agent Satterlee.

(Docket 87 at p. 6).

The court adopts the magistrate judge's finding that the defendant mischaracterizes the record.   Agent Satterlee testified he and the other law enforcement officers were receiving information from other members of the team. (Docket 64 at p. 32:18-20).   That information included reports from the agent who was "actually chatting" with "Alex c," and Agent Boone who read the license plate and identified a blue, not red, van and that the van was going around to the back of the Common Cents' property.   <u>Id.</u> at p. 45:12-20; <u>see also</u> Exhibit 1A at p. 1.   Agent Satterlee observed the newer model minivan come around the

10

building and pull up next to his Nissan Maxima.   (Docket 64 at pp. 32:22-33:1; 35:9-13; 37:14-15 & 38:2-5).

Based on their previous law enforcement experiences together, Agent Satterlee trusted Agent Boone's judgment.   (Docket 64 at p. 96:9-16).   It was reasonable for Agent Satterlee to assume Agent Boone observed a newer model Chrysler minivan with a Saskatchewan license plate and was simply reporting a blue van with the license plate number as best it could be observed.   See United States v. Mendoza, 421 F.3d 663, 667 (8th Cir. 2005) ("[T]he police possess specialized law enforcement experience and thus may draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous. . . . [the court must] view the totality of the circumstances . . . through the eyes of the experienced . . . agents involved . . . [and] give due weight to inferences drawn from the facts and circumstances of each case by local law enforcement officers." (internal quotation marks and citation omitted).

Defendant's objection number 1 is overruled.

2. That Thymaras parked and was arrested in a "remote area."

It is a fair description of the parking lot in the back of the Common Cents as a remote area.   Agent Satterlee's vehicle was the only vehicle parked in that specific area of the lot.   When compared to the front parking lot which faces Junction Avenue and is heavily traveled, the back parking lot can be fairly described as remote.

11

Defendant's objection number 2 is overruled.

9. That Agent Satterlee had "team" information regarding the Thymaras' identity prior to calling for his arrest.

(Docket 87 at p. 8).

The defendant argues the magistrate judge improperly concluded that Agent Satterlee had information from other law enforcement team members and should have found he only had information from Agent Boone.   (Docket 87 at p. 8) (referencing Docket 82 at p. 9; Docket 64 at pp. 43-1-9 & 79:16-22).   Mr. Thymaras submits this change in the statement of facts is necessary because Agent Satterlee "conceded that he was not receiving all of the information the rest of the team had . . . and he did not have any access to the text messages allegedly being exchanged between Thymaras and the rest of the surveillance team . . . ." Id. at p. 20 (referencing Docket 64 at pp. 43:1-9 & 46:8-11).

The facts known to law enforcement prior to the arrest of Mr. Thymaras are outlined in the report.   (Docket 82 at pp. 3-4 & 9-10).   Agent Satterlee testified he received updated summary information on his radio from the other agents.   (Docket 64 at pp. 18:10-13; 22:21-23 & 43:4-11).   Agent Satterlee was receiving contemporaneous radio transmissions from the team member who was conversing with "Alex c."   Id. at pp. 32:11-20 & 43:4-11.   The transmissions included reports "Alex c" was in contact with the other agent, that he was stuck in traffic and going to be late.   Id. at p. 43:4-9.   These summaries began to

12

provide a focus as to who "Alex c" was and when he was expected to arrive at the Common Cents.   Id. at p. 208:18-209:15.

Information regarding the true identity of "Alex c" was developed through the information gained during e-mail and text messaging and the work of the law enforcement team members visually observing a minivan matching the general description of "Alex c's" van arriving at the Common Cents' parking lot.   The report of the magistrate judge correctly noted that Agent "Satterlee received information from other team members regarding the identity and actions of the defendant."  (Docket 82 at p. 9).

Defendant's objection number 9 is overruled.

> 3. "Agent Troy Boone, a member of the surveillance team, alerted other team members that he identified a blue van *with Canadian* plates" pulling into the parking lot at the takedown site (emphasis in original).

(Docket 87 at p. 7).

The defendant argues the magistrate judge "expanded and assumed facts not in the record."   (Docket 87 at p. 22).   Rather than " 'observ[ing]' a minivan with Canadian license plates enter the parking lot . . . . The recording from the arresting surveillance team . . . only shows the officers broadcasting a license plate aloud, with no mention of the plates bearing Canadian, let alone Saskatchewan, identifiers."   Id. at pp. 21-22.

The surveillance team was waiting for a red Chrysler minivan with Saskatchewan license plates to appear at the Common Cents.   While the

recording of the radio communications does not mention Saskatchewan, Canada, license plates, Agent Boone also does not mention that the blue van was either a Chrysler model van or a minivan.   Agent Boone reported, however, that the vehicle which drew his attention was a "blue van, it's not red[]" and the agent included a partial license plate number which he was able to read.   (Exhibit 1A at p. 1).

Defendant's hyper-technical expectation that Agent Boone is required to convey the entirety of his observations to Agent Satterlee is without merit.   It was reasonable for Agent Satterlee to assume Agent Boone had observed a blue Chrysler minivan with Canadian license plates entering the front parking lot of the Common Cents store when Agent Boone read off the partial license plate number.   Mendoza, 421 F.3d at 667.   The magistrate judge accurately reported the factual presentation made at the suppression hearing, including all reasonable inferences an objectively reasonable officer was entitled to make.   Id.

Defendant's objection number 3 is overruled.

4. That it is a mischaracterization of the record to conclude that Agent Satterlee did not make visual contact of Thymaras before calling for his arrest.

(Docket 87 at p. 7).

As the blue minivan came around the corner of the Common Cents building, Agent Satterlee made visual contact with the vehicle.   (Docket 64 at p. 23:2-9).   Mr. Thymaras' vehicle pulled up next to Agent Satterlee's car.   Id. at p. 23:11-13).   While other vehicles had come around to the back of the Common

14

Cents and then continued on, Mr. Thymaras' vehicle came around the building and parked next to Agent Satterlee.   Id. at p. 45:17-21.   Based on his training and experience, Agent Satterlee reasonably concluded that when Mr. Thymaras' minivan pulled in next to the agent, this was the individual they had been waiting for.   Id. at p. 79:19-22.

The magistrate judge acknowledged this development of the facts in the report and recommendation.   (Docket 64 at p. 4).   The magistrate judge did not mischaracterize the record.

Defendant's objection number 4 is overruled.

7.   That Thymaras "walked around the back of his vehicle and toward the undercover vehicle."

(Docket 87 at p. 8).

The defendant argues that Agent Satterlee "conceded" Mr. Thymaras was walking at an angle away from the agent when the agent waved Mr. Thymaras to come back to the passenger door.   (Docket 87 at p. 8) (referencing Docket 64 99:6-100:6; 103:22-104-10).   The defendant submits Mr. Thymaras had to change the course of his walk, stop and change directions to go to the agent's vehicle because of his "vigorous gesturing."   Id. (referencing Docket 64 99:6-100:6 & 103:22-104:10).

The defendant ignores Agent Satterlee's specific contradiction of the defendant's interpretation of the evidence:

One of your statements, if I can clarify something, I did not get the impression he was walking by my vehicle, that I stopped

15

> him from walking away from my vehicle.   He came around,
> was looking at my vehicle.   I made eye contact with him and
> gestured to him again.   So when you say why wouldn't I have
> not let him just continue walking by the vehicle?   I did not get
> the impression he was walking by my vehicle.

(Docket 64 at p. 52:15-22).   Defendant also ignores Agent Satterlee's testimony

in the middle of the section referenced in defendant's objection.   "My impression

is he's not walking [to the Common Cents[] because he's looking at me walking;

he's not walking to Common Cents, he's walking at that angle, and once he make

eye contact then he quickly turns."   Id. at pp. 99:16-19.

The magistrate judge, having reviewed the video from the camera inside

Agent Satterlee's car, and having considered Agent Satterlee's testimony,

properly concluded that Mr. Thymaras walked around the back of his minivan

and approached the agent's vehicle.   (Docket 82 at p. 4).

The court reviewed Exhibit 1, the video of the hidden camera from inside

Agent Satterlee's vehicle.   (Docket 64 at pp. 28:23-29:3).   It is a reasonable

interpretation of events that Mr. Thymaras parked next to the agent's vehicle,

came around the back of his minivan and intended to approach Agent Satterlee.

Id.   The agent's gestures to get into his car were simply a culmination of the

parties' intent to meet.   Id.

Defendant's objection number 7 is overruled.

8.   That the R&R omits when in the sequence of events Agent
     Satterlee called for the arrest.

(Docket 8 at p. 8).

16

Agent Satterlee made the call to arrest Thymaras.   (Docket 82 at p. 9) (referencing Docket 64 at p. 45).   Use of the code word "Disneyland" was the call sign to arrest Mr. Thymaras.   Id. at p. 34:16-20.

It is clear the decision to arrest Mr. Thymaras occurred when the signal "Disneyland" was broadcast by Agent Satterlee.   (Exhibit 1 & Exhibit 1A at p. 1). While Agent Satterlee had probable cause to arrest Mr. Thymaras while he was still in the minivan, the arrest was not effectuated until after the conversation occurred in the agent's vehicle.   Specifically referencing the video and Mr. Thymaras' statements in Agent Satterlee's vehicle, the magistrate judge wrote "[a]t that point, the take down team arrived and placed Thymaras under arrest." (Docket 82 at p. 5) (referencing Docket 64 at p. 27 & Exhibit 1).

Defendant's objection number 8 is overruled.

The statement of facts in the report and recommendation on the matter of the probable cause for arrest are adopted in full.

POST-ARREST INTERROGATION

Because of the specific nature of defendant's objections in this area, only facts relevant to each challenge will be addressed.

> 6. That "Thymaras was transported a short distance to the State Department of Transportation to be interviewed," implying that the interrogation occurred within the confines of the building.

(Docket 87 at p. 7).

17

DCI Special Agents Jonathan Kirk and Brett Spencer were assigned the task of interviewing Mr. Thymaras.   (Docket 64 at p. 141:24-25).   The agents drove Mr. Thymaras to the South Dakota Department of Transportation shop on the west side of Sturgis, South Dakota.   Id. at p. 146:22-23.   The entire interview of Mr. Thymaras occurred in Agent Kirk's vehicle.   Id. at p. 147:17-25. Following the completion of the interview the agents took Mr. Thymaras to the Meade County Jail.   Id. at pp. 154:23-155:1.   The report and recommendation read in context with the suppression hearing transcript does not suggest that the interview of Mr. Thymaras occurred inside a building at the Department of Transportation site.

Defendant's objection number 6 is overruled.

5.   That, during his post-arrest interrogation, Thymaras "indicat[ed] familiarity with watching [Miranda] rights being read of [sic] television."

(Docket 87 at p. 7).

Exhibit 2 is a CD of the audio portion of the agents' interview of Mr. Thymaras.   (Docket 64 at pp. 148:25-149:12).   Exhibit 2A is a transcript of the recording of the interview.   Id. at p. 149:24-150:13.

Mr. Thymaras' objection asserts he "never expressed familiarity with Miranda warnings during his post-arrest interrogation."   (Docket 87 at p. 7). The magistrate judge found the agents announced their intention to read Mr. Thymaras his Miranda rights, "like '[he'd] probably heard 'em on TV.' "   (Docket 82 at p. 6).   The magistrate judge found Mr. Thymaras responded on the audio

18

recording of the interview "with a very clear and audible, 'Yeah' indicating familiarity with watching rights being read on television." Id. (referencing Exhibit 2 at 5:27).

The court reviewed both Exhibits 2 and 2A.   The audio recording of the interview very clearly picks up Mr. Thymaras saying "yeah" in response to the agent's statement about how Mr. Thymaras had probably heard of the Miranda rights being read on television.   (Exhibits 2 at 5:20-29 & 2A at pp. 7-8).   Mr. Thymaras' response can reasonably be interpreted as expressing familiarity with the Miranda rights process.

Defendant's objection number 5 is overruled.

**LEGAL CONCLUSIONS**

The defendant's objections to the magistrate judge's legal conclusions are as follows:

1. Probable cause to arrest Thymaras is justified by events that transpired after the arrest call – "Disneyland" – was made[.]   (Docket 87 at p. 8) (citing Docket 82 at pp. 9-10).

2. The R&R relies upon cases where knowing, intelligent *Miranda* waivers were obtained, where the arrestee was presented with a written waiver form.   Id. (citing Docket 82 at p. 14).

3. The R&R states that there was no violation of Thymaras' Vienna Convention rights . . . . Id.

Each of these objections will be separately addressed.

1. Probable cause to arrest Thymaras is justified by events that transpired after the arrest call – "Disneyland" – was made.

(Docket 87 at p. 8).

"Probable cause sufficient to make a warrantless arrest exists when 'the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.' . . . A 'probability or substantial chance of criminal activity, rather than an actual showing of criminal activity' is sufficient.' " Jones, 535 F.3d at 890 (quoting United States v. Torres-Lona, 491 F.3d 750, 755-56 (8th Cir. 2007).   "Probable cause exists if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed an offense at the time of the arrest." Green v. Nocciero, 676 F.3d 748, 751 (8th Cir. 2012).

As discussed above in resolving defendant's factual objection number 8, Agent Satterlee made the call to arrest Mr. Thymaras while he was still in his minivan.   (Exhibit 1 & Exhibit 1A at p. 1).   Agent Satterlee had probable cause to arrest Mr. Thymaras while he was still in the minivan, but the arrest was not effectuated until after the conversation occurred in the agent's vehicle. Contrary to defendant's argument, it was at that point to which the magistrate judge was referring in concluding as a matter of law that an arrest had occurred. "At that point, the take down team arrived and placed Thymaras under arrest." (Docket 82 at p. 5) (referencing Docket 64 at p. 27 & Exhibit 1).

At the point Mr. Thymaras was actually placed under arrest, probable cause existed to believe he had committed the State offense of solicitation of a minor in violation of SDCL § 22-24A-5(1).   Mr. Thymaras, through "Alex c," contracted with the pimp and solicited to engage Steph, a 15-year-old, in a

prohibited oral sex act.   Mr. Thymaras' arrival at the scene confirmed he was "Alex c" and his apologies and excuses for running late solidified that he was "Alex c" and was looking for sex with a minor.   Whether the sexual act was for a 17-year-old cousin or himself is irrelevant to the analysis.   All the elements of the offense alleged had been committed and the agents acted lawfully in executing the arrest.

"Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest.   Instead, the mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required."   United States v. Winarske, 715 F.3d 1063, 1067 (8th Cir. 2013) (internal quotation marks and citation omitted).   Defendant's arguments to the contrary do not defeat an officer's reasonable interpretation of events and the establishment of probable cause to justify an arrest.   United States v. Chappell, 779 F.3d 872, 878 (8th Cir.), cert. denied, 136 S. Ct. 281 (2015).

Defendant's objection number 1 is overruled.

2. The R&R relies upon cases where knowing, intelligent Miranda waivers were obtained, where the arrestee was presented with a written waiver form.

(Docket 87 at p. 8).

Because the magistrate judge discussed cases involving the use of written waiver of Miranda rights forms, the defendant argues the cases cited in the R&R

21

are irrelevant.   (Docket 87 at p. 8).   The defendant asserts that United States v. Garibay, 143 F.3d 534 (9th Cir. 1998) is the "controlling case" "on the issue of the sufficiency of a dual citizen's knowing and intelligent waiver of his *Miranda* rights."   (Docket 87 at p. 22).   While the magistrate judge cited Garibay as identifying factors to be considered "in deciding whether a foreign national voluntarily waived his Miranda rights," Garibay is not a case involving dual citizenship.   (Docket 82 at p. 20).   Rather, Garibay involved a foreign national whose "primary language" was Spanish and who understood "only a few things in English."   Garibay, 143 F.3d at 537.   The court analyzed Mr. Garibay's waiver of his Miranda rights in light of these and other factors.   Id. at 538-39.

Those factors are not present in this case.   Mr. Thymaras, although he spoke with a Canadian accent, spoke English as his native language and he had no difficulty understanding Agent Kirk's explanation of the Miranda rights. (Docket 82 at pp. 5 & 25; see also Exhibit 2 at 5:20-6:40).

After having been advised of his Miranda rights by Agent Kirk, Mr. Thymaras can be heard on the audio recording responding to the question: "Do you understand these rights?" by stating "I do."   (Exhibits 2 at 6:30 & 2A at pp. 8-9).   As Mr. Thymaras orally responded he also nodded his head indicating he understood his rights.   (Docket 64 at p. 260:6-11).   Agent Kirk then asked "You do?" and Mr. Thymaras nodded affirmatively a second time.   Id. at p. 260:11-13.

22

In response to Agent Kirk's statement "Do you wish to waive these rights and talk to the two of us at this time?" Mr. Thymaras answered "Sure." (Exhibits 2 at 6:30-6:35 & 2A at p. 9; <u>see</u> <u>also</u> Docket 64 at p. 260:17-22).

The magistrate judge analyzed these factors and applied case authority from the United States Supreme Court and the United States Court of Appeals for the Eighth Circuit. (Docket 82 at pp. 23-24) (citing <u>Berghuis v. Thompkins</u>, 560 U.S. 370 (2010) (citing <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-76 (1979); <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) and <u>United States v. Barahona</u>, 990 F.2d 412, 418 (8th Cir. 1993)); and <u>United States v. Garlewicz</u>, 493 F.3d 933, 936 (8th Cir. 2007)). The magistrate judge concluded that under the totality of the circumstances Mr. Thymaras "was properly informed of his <u>Miranda</u> rights" and "knowingly and voluntarily waived those rights." (Docket 82 at p. 26).

Also important to the <u>Miranda</u> waiver analysis is the reality the defendant did not object to the report and recommendation findings that Mr. Thymaras' <u>Miranda</u> rights were properly read to him and he knowingly and voluntarily waived his rights before the interview continued. (Docket 82 at pp. 6, 23 & 25-26).

The remainder of defendant's argument in support of the objection is without merit. The magistrate judge properly analyzed the factors in this case and correctly applied the appropriate case authority in arriving at the legal conclusion Mr. Thymaras knowingly and voluntarily waived his <u>Miranda</u> rights.

Defendant's objection number 2 is overruled.

3. The R&R states that there was no violation of Thymaras'
   Vienna Convention rights because the officers allowed
   Thymaras to contact the Canadian consulate after he was
   interrogated.

(Docket 87 at p. 8).

Mr. Thymaras argues the magistrate judge erred as a matter of law because defendant's dual citizenship entitled him to the protection and rights afforded him under the Vienna Convention on Consular Rights.   (Docket 87 at p. 19).   He asserts "[t]he interrogating agents' failure to properly or timely advise Thymaras of [his rights under the Vienna Convention] constituted a clear, fatal violation of the Vienna Convention."   Id. at p. 20.   In support of his argument, Mr. Thymaras cites to dicta in a footnote from Napier-El/Bey v. Johnson, Civil Action No. 2:05-CV-0521, 2006 WL 1582414 (E.D. Va. June 1, 2006).[7]   Id.   The defendant argues that "[a]pplying the 'predominance' test" from this case compels the court to reverse the magistrate judge's ruling and find Mr. Thymaras should have been provided access to the Canadian Consulate before his interview began.   Id. at pp. 20-21.

The magistrate judge concluded that "[w]hether Thymaras has an enforceable right under the Vienna Convention, does not require an answer because at least seven circuits have determined that, even if such a right exists, defendants would not be entitled to suppression of their statements."   (Docket

---

[7]The defendant advanced the same argument, supported by the same singular citation, in post-hearing briefing.   (Docket 66 at p. 2).

82 at p. 19) (references omitted).   The defendant asks the court to reject the magistrate judge's report because it relied on case authority from seven circuits and "it is unclear what the scope and breadth" of the Eighth Circuit's ruling would be on suppression of a statement for violating the Vienna Convention. (Docket 87 at p. 25).

While the Eighth Circuit has not specifically addressed the issue, the court did find a defendant's rights under the Vienna Convention do not mandate that a law enforcement "interrogation cease until consular contact is made." United States v. Ortiz, 315 F.3d 873, 887 (8th Cir. 2002).   The Supreme Court held that a party's rights under the Vienna Convention do not impose an obligation of suppression of a statement given in advance of or in violation of the rights established by the Vienna Convention.   "Article 36 [of the Vienna Convention] has nothing whatsoever to do with searches or interrogations. Indeed, Article 36 does not guarantee defendants *any* assistance at all.   The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention—not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention."   Sanchez-Llamas v. Oregon, 548 U.S. 331, 349 (2006) (emphasis in original).   "The failure to inform a defendant of his Article 36 rights is unlikely, with any frequency, to produce unreliable confessions.   And unlike the search-and- seizure context—where the need to obtain valuable evidence may tempt authorities to transgress Fourth Amendment

25

limitations—police win little, if any, practical advantage from violating Article 36.   Suppression would be a vastly disproportionate remedy for an Article 36 violation."   Id.

The Eighth Circuit recognized the limitation of the exclusionary rule expressed by the Supreme Court in Sanchez-Llamas and reminded the district courts that "[w]e have cautioned courts in criminal cases to be wary of extending the exclusionary rule to violations not of constitutional magnitude."   Downs v. Holder, 758 F.3d 994, 998 (8th Cir. 2014).

The court concludes the magistrate judge correctly analyzed and applied the law to the facts in this case.   As a citizen of the United States with dual citizenship in Canada, Mr. Thymaras is not entitled to be informed of his rights under the Vienna Convention or to have his interrogation stop pending his consultation with the Consulate.   Sanchez-Llamas, supra; Downs, supra; Ortiz, supra.

Defendant's objection number 3 is overruled.

OBJECTION TO THE GOVERNMENT'S RESPONSE

On October 1, 2015, the government filed a motion to extend the time to file its response to the defendant's objections.   (Docket 91).   The motion contained a declaration that defense counsel did not oppose the motion.   Id. After the government's response, the defendant filed an objection.   (Docket 98). Mr. Thymaras now objects to the government's submission arguing Fed. R. Crim.

26

P. 59 does not provide a right to respond to an objecting party's filing.   (Docket 98 at p. 1).

It has long been the practice of the court to permit either party in a criminal case to file a response to an opposing party's objections to a R&R. While not specifically allowed by Fed. R. Crim. P. 59(b), that rule is modeled after Fed. R. Civ. P. 72 which specifically authorizes a response in civil matters.   See commentary to Fed. R. Crim. P. 59 ("The rule is derived in part from Federal Rule of Civil Procedure 72.").

Defendant's objection to the government's response is overruled.

DEFENDANT'S REQUEST TO FILE A REPLY

There is no authority in either Fed. R. Crim. P. 59 or Fed. R. Civ. P. 72 for the filing of a reply brief.   It has been the practice of the court not to permit a reply because the party opposing a report and recommendation is required to fully articulate its objections in the initial filing.   Rule 59(b)(2).   The court finds no reason to vary from that practice is this case.

Defendant's motion for leave to file a reply is denied.

## ORDER

Based on the above analysis, it is

ORDERED that the defendant's objections (Docket 87) are overruled.

IT IS FURTHER ORDERED that the defendant's motion (Docket 98) to strike the government's response (Docket 94) is overruled.

IT IS FURTHER ORDERED that the defendant's motion (Docket 98) for leave to file a reply to the government's response is denied.

IT IS FURTHER ORDERED that the report and recommendation of Magistrate Judge Wollmann (Docket 82) is adopted by the court consistent with this order.

IT IS FURTHER ORDERED that the defendant's motion to suppress (Docket 51) is denied.

IT IS FURTHER ORDERED that the physical evidence gathered at the time of the defendant's arrest, including but not limited to evidence gathered from Mr. Thymaras' person and from the inventory search of the automobile, is admissible at trial in the government's case-in-chief.

IT IS FURTHER ORDERED that the statements made by Mr. Thymaras, both before and after the advisement of his <u>Miranda</u> rights, are admissible at trial in the government's case-in-chief.

Dated June 10, 2016.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE